2015-1281 Waters v. Agilent Good morning, Your Honors. My name is Dr. Deborah Vernon, and I'm of McCarter and English, and I represent Waters Technology Corporation, the patent owner appellant in this case. So the primary issue can be boiled down to, is constant compressibility compensation, I'm going to use the term CCC for short. So is constant compressibility compensation merely a result of placing a pressure regulator behind any pump, such as a syringe pump, or is it a requirement of the claims? Pumping a pump having a mechanism to set a portion of its stroke to compression and the remainder to delivery? This is an important question because the claims stand rejected based upon art that all parties agree do not teach pumping on a CCC. You can find that at A-19 of the record. Use that acronym again. Okay, I'm sorry, I apologize. No, I mean, I'm serious. I understand. It's very hard to get to the bottom of what was at issue here, that the whole brief was written in acronyms. Very true. So the art that was cited in the rejections all teach placing a pressure behind a syringe pump. The broadest reasonable construction must be consistent with a specification as  to what seems to me your principal problem. The screw and the syringe. Do I have the two terms right? In the specification, which I take it from a page in your reply brief, you fundamentally don't have an answer for. So when you say the screw versus the syringe, are you talking about a... You really don't know what I'm talking about? So are you talking about there's a passage in the specification that says various types of pumps are also capable of delivering flow, such as reciprocating dual piston diaphragm and screw pumps. Right, column six lines 22 and so on. So first of all, that passage doesn't state syringe pumps. It states screw pumps. I'm sorry, diaphragm is what I meant. Diaphragm pumps, okay. So that passage, first of all, talks about various types of pumps. If you look at a couple of sentences beforehand, it talks about an exemplary embodiment. Right, so these are embodiments. So they potentially are embodiments and in the next sentence, which we're talking about this various types of pumps are also capable. It doesn't define CCC. It doesn't have to be defined. The principle here is that when embodiments are called out, that's a pretty good reason, not conclusive, but pretty good reason to think that the claim covers them. And I take it from the relevant page on your reply brief, which said this is not definitional, they're mere embodiments. Those seem to me just not to be responsive to the core point. So that if there were ambiguity in the claim language, these embodiments seem to me to defeat the idea that the pump itself has to have a compensation mechanism in it. I turn to what this court has looked to for the broadest reasonable construction, and I believe it was In re Abbott Diabetes Care in 2012, this court, where a similar question where one embodiment or an exemplary embodiment was unclear about whether or not it included or it could possibly include wires, but yet the claim language, which didn't say it had to be wire-free, but was a sensor that the specification made clear should be wire-free. This court found that just because- There are different embodiments and the claim language in some situations can in fact not cover particular embodiments if it's clear enough. My problem is that this peculiar claim language that talks about pumping and delivery and at a compensation, a constant compressibility compensation, leaves unclear exactly how those things fit together, and as long as it's unclear, one needs to find something in the spec that says embodiments that I think you admit are embodiments of this would be outside it, and I don't see how you get over that hurdle. Well, what I would say to that, Your Honor, is that this is a passage that is to an embodiment, it's not the entire thing, so you're asking to read out- How do we read out of the claim an actually expressed embodiment? We have lots of cases that says it's inappropriate to read a claim in such a way to exclude an embodiment, a disclosed embodiment, so you've disclosed claim, you've disclosed embodiments where the pump does not have that constant compressibility, compensation compressibility capacity, I'm going to add another C, so you've actually disclosed situations in which the pump itself doesn't do that, so why is it irrational for the Board to believe that accomplishing that is something that doesn't have to be a capability of the pump itself rather than of the flow? Well, I think it's because it's inconsistent with other parts of the specification, so in other parts of the specification, and if we were to turn to, for instance, the summary of the invention, and this is at column three on page A35, we're told that the invention pertains to converting a pump with a constant compressibility compensation. If we move on to the next paragraph, it says, in the present invention, unmodified HPLC pumps can deliver reproducible flow conditions despite having limited compressibility compensation ranges and no ability to dynamically compensate, so why would one say, or it would be inconsistent to say, that you would get the present invention despite having constant compressibility compensation if that was just a result? What is the conversion and the modification to the pumps that are being referred to there? So here, it's an unmodified HPLC pump. It has this limited compressibility compensation range, no ability to dynamically compensate, and our claims tell us that there is a back pressure regulator that is conditioning the flow behind that HPLC pump to allow for the use of constant compressibility compensation to deliver the controllable flow, and that is further stated just a few lines down under the result, this is at line 36, the result of the invention is controllable flow of a compressible fluid delivered downstream of the regulator, it doesn't say controllable flow at a constant compressibility compensation, to the mobile phase and into the SFC column without performing dynamic compression. So let me try to phrase what may be more of a confusion than anything else, but confusion I think unfortunately doesn't help you here. So the way that this claim is written, it seems to me to leave unclear whether the at a constant compressibility compensation is meant to apply, I'll use a shorthand here, to the word pumping or to the word delivery, and if that's unclear, then it seems to me that that makes sense, at least under a broad reasonable interpretation, of including some of these non-pumping, I don't know what they call it, the diaphragm and the screw pump, one without a plunger in it, which means it would be one reasonable way of interpreting this language which could apply that language to the delivery, which is clearly how the board thought of it, and not as a description of an activity of the pump itself. So why does that, it seems to me, what I want to hear is, is there some reason that just does not make physical sense in terms that you can try to make me understand? Sure. So I think there's a couple of things. One, I think that the claim limitation is a mouthful, but I think that what was going on here was that it was written for one of ordinary school in the art, and what the drafters of the patent wanted to make clear was that there was a problem and a solution that they wanted to make perfectly clear, and so therefore it talks about pumping as the first active step, but there are three places in this limitation where it mentions the compressible fluid, and the fact that you are compressing or that you're pumping to get your constant, to get your controllable flow without needing that dynamic compensation. So I think, first of all, the claim does need to be read in context of the specification. Second, you are asking, I think, what you're struggling with, Your Is it just a back pressure regulator that can condition the flow, and once you've conditioned the flow, then why do you need anything else? You don't need to do the conditioning inside the pump as long as what leaves the back pressure regulator has the required properties. That's all that this invention cares about. That's where another part of the confusion and another part of reading out from the claim comes from, and that's about compressible fluids, because the specification tells us that pumping and controlling flow rates in compressible fluids is hard. Compressible fluids change state or density very easily under slight changes of pressure and temperature, like when you pump them, and so as you can imagine, if you're pumping this fluid, and one second it's a gas, one second it's a liquid, one second it could be ice chunks, and so what the prior art did was it had something called dynamic compensation. It basically had monitors to constantly understand what state that fluid was in, and once it understood that state, it would change how it actually compressed the fluid. Does that answer your question? I'm sorry, I went on a little bit longer. So I guess if that's the concern, that you don't need this dynamic system to adjust the Z rate, then why do you need a separate compressibility capability for the pump? So once you condition that flow, and these claims make it clear that you need multiple steps, you need a pressure or maintaining step to sort of condition that flow, to limit this wild unpredictability. So you're limiting that predictability. You've made a compressible fluid act a little bit less compressible, but it's still compressible, and you still have to deal with the fact that downstream it's probably mixing with other fluids, and it's still, you need to account for that condition of that fluid to get it out or produce a fluid and deliver the flow. So, but I mean, why is it irrational to read this specification to say that it is the flow stream that is accounting for that, that is protecting against the variations in compressibility?  Summary of invention, and I'm at the bottom of column 3, and this is page A35. It says, any types of back pressure regulators work with their preferred embodiment. The density of the liquid in the pump varies over a carefully controlled range during refill and delivery. This is the type of pump that is, this HPLC pump that we talked about. If the inlet pressure is relatively high, then the fluid is less compressible. If the temperature in the fluid is maintained over a constant, the fluid is still less compressible, and there's no change in compressibility. So here we're turning to the point that we're telling you, you need to condition that flow to make it less compressible. Right, but you're saying that, so you're saying that it's the flow, which according to this could be governed by a syringe pump, and as long as the flow is correct, in other words, if you're able to do away with variations in Z completely by the flow, then why do you even need anything else? I think I understand your question. So maybe it's the difference then between a syringe pump and the type of pump that is claimed here. And the syringe pump doesn't have the same sort of control. We even see that in the specification. Early on, it talks about these pumps are more accurate than syringe pumps. But what is going on here is that in reciprocating pumps, you have inlet and outlet check valves that help you to control that pressure over a small volume of fluid. In a syringe pump, you don't have those check valves. Well, the syringe pump I get is just controlling the flow. I mean, that's what's causing the flow, right? So flow, you need to pressurize and create the conditions to move the flow and meter that flow. We want to have a controllable flow rate. We don't want to just pressurize. We want to meter out what's coming out. Okay, you've used all of your time and all of your rebuttal time. So I'll restore two minutes of your rebuttal time, but let's move on in here from Mr. Green. Thank you, Your Honor. I'm here responding to Waters' argument as aptly. We are defending the decision of the examiner, which found that these claims should be construed so as they are not limited to a constant compressibility compensation pump. We are defending the decision of the Board, which decided that these claims were not limited to a constant compressibility compensation pump. And I think that the Board has done an admirable job going through the... Is your best argument that specification discloses pumps that just don't do that and claims that they're embodiments of the invention? That's half of it. The other half is the language of the specification, which says, and I can quote at least one example in column 5 to line 66 through column 6 to line 5. The present invention does not require knowledge of the compressibility constant of the fluid being delivered to the chromatography system because the pump is pumping at constant pressure. That's the back pressure. The pump can run at different flow rates in an open loop with no compressibility compensation. The pump is controlled by the constant pressure and therefore the flow rate may be changed independent of compressibility. There are other examples from the specification at A16 in the record. We also rely, of course, on the exemplary embodiments of the invention, which are the diaphragm and screw pumps. There appears to be no dispute that screw pumps do not have any compressibility compensation. Is there a dispute about diaphragms? Obvious question from the way you just phrased your point. I didn't think there was either. I don't think there is either, but I focused on screw pumps because the Board does as well. And it is this section that distinguishes in-ray diabetes care, which is a case cited by my counterparty, my countercounsel, as distinguishing this point. In in-ray diabetes care, the single example that was excluded by the claims was a reference to the prior art. This is a reference to exemplary embodiments of the present invention. We also would point to the claims and rely on the broadest reasonable interpretation standard. I think if you read the claims, it is clear that... Can I ask you to step back and maybe just try to explain to me what it means for there to be a certain kind of compensation, I forget what goes in front of that, at which either pumping or delivery occurs when there is no response of some compressibility-altering device to the compressibility to which it is responding. I'm sorry, Your Honor. If that is a question based on the argument we just heard from Waters counsel... The language of the claim talks about a constant compressibility compensation. And it says something has to occur at that. So it's at some sort of compensation. Can you explain in common sense terms how to give affirmative meaning to those words when there is no adjustable plunger in a device? Well, the specification and the board, considering the declaration from Waters' expert, concluded that that was a result of pumping against the back pressure, the elevated back pressure. And that's the way the claim is written. I don't know what the word that in your sentence refers to. That being the constant compressibility compensation is a result of creating a controllable flow stream, which is the result of pumping against the back pressure. And that pumping can be done by any pump that doesn't have already built into it compressibility compensation. That's what is described in the specification. How do you respond to your argument on the other side that what the invention is doing and what the specification is describing is not a situation in which there doesn't have to be any kind of control in the pump, but where you don't need a dynamic control? And that was the whole point. That was the expense of pumps that they were trying to do away with. And so in prior art, there would have been both, right? A dynamic flow control as well as a constant compressibility control. So what they're saying is they're only doing away with the one, not the other. My response is respectfully they're misconstruing the specification. The specification is broader than just allowing a constant compressibility pump to be used instead of a dynamic compressibility pump. The specification is very clear that you don't need to control for compressibility at all in the pump you're using, and you still get a controllable flow at a constant compressibility and a constant compensation. And that's what the board found citing material at A-16 in the record. They looked at the declaration of Dr. Cordia. They in fact relied on that declaration in coming to their claim construction. So whether you look at this as a de novo or you look at this with deference, there's no doubt I think that the board got it right when they read the specification and understood the science. What about the two particular points that your opponent referred to in column 3, starting at line 16? In particular, the invention pertains to converting a pump with constant compressibility compensation for use in gradient elution supercritical fluid chromatography. Doesn't that imply that the pump has to have a constant compressibility compensation mechanism? I would say no, Your Honor. This is one example of a type of pump that can be used to achieve the claimed result, but the specification goes on to be very clear. That's not describing an embodiment. This is what the present invention is. That's describing the present invention. Yes, Your Honor. I'm referring to other parts of the specification that talk about the present invention as not requiring knowledge of the compressibility constant of the fluid. There are several instances in the specification, which are cited in the board decision, where the present invention is described as not requiring any adjustment for compressibility and you still get the controllable flow at a constant compressibility compensation that's claimed. So, I would say that this section that talks about pertaining doesn't limit the scope of the invention. To the extent that it applies, it's talking about using a constant compressibility compensation pump as one thing that could be used, but you could also use other things, like the diaphragm and screw pumps that are described in the specification. Do you have anything further? No, Your Honor. Okay. Thank you, Mr. Bowen. Mr. Green. Okay, Ms. Vernon, you have two minutes of rebuttal. So, just one quick point about a case that opposing counsel mentioned in rate diabetes, saying that it was referring just to the prior art. There actually was an embodiment in the specification that had wires. But, moving on to the passages that Agilent cited, I would say that, first of all, I'd like to point out that none of these state constant compressibility compensation. Also, I believe that the passages are read out of context in the sense that they don't take into account the without dynamic compensation requirement. Well, you know, the context is the specification, but that passage that begins at the bottom of column 5 and goes over to the top of column 6 is pretty strong, at least for the argument against you. The starting at line 2, the pump can run at different flow rates in an open loop with no compressibility compensation. And then it says, the pump is controlled by constant pressure, and therefore flow rate may be changed independent of compressibility. How do you get around that line? Right, but the next sentence goes to without the need for dynamic compensation. And so, if we read the passage in its entirety, we see that these passages are really referring to what the problem is in this case, which is you want to get over using that dynamic compensation, which is imperfect because it's always chasing its tail. But how do we know that it's not just getting around dynamic compressibility compensation, but it's getting around the need for a separate independent constant compressibility mechanism? Because you still need a compressibility compensation mechanism to deal with the fact that while you've narrowed that change in compressibility of the compressible flow, you still have a fluid that has some compressibility to it. Do you concede that it doesn't actually say that anywhere in the specification? Now you say someone with skill in the art would understand that, but it doesn't actually say that, does it? Putting all those exact lines together, no it does not. Someone of ornery skill in the art would understand that. If I may direct your attention though to some of the mistakes that are clearly highlighted in the board's findings, and you can find those on pages A14, A15 of the board's record, I would like to point out the fact that a lot of these findings and conclusions actually don't have any support to the evidentiary record. So there's no site to any authority for these findings, such as... Okay, well I think we're beyond our rebuttal time and the extended time I gave you, so I think we're going to have to finish up. I thank both counsel for their argument. The case is taken under submission. Thank you.